Edow. All right. Mr. Norris, we'll hear from you first. Good morning, Your Honors, may it please the Court. In the Meriwether case, the Sixth Circuit described the topics of gender identity and preferred pronouns as sensitive, controversial, and hotly contested. Linmar has taken a side in that controversy. Policy 504.13r implements what's known as the gender-affirming model of care, where children's stated gender identity is affirmed no matter what. People of good faith can disagree about whether that treatment is best for kids. But under the 14th Amendment, the government can't impose that treatment on children behind their parents' backs. And under the First Amendment, the government can't force dissenting students to mouth their support for it. Because Linmar's policy crosses both those lines, it should be preliminarily enjoined. I'd like to start with what I think was the key issue for the District Court, which is our standing to bring the parental rights claim. When assessing standing, this Court has to assume that we're right on the merits. So this Court has to assume that this policy was enacted and it would violate parents' constitutional rights to participate in and know about their child's, how the school is treating their child's gender identity. And so our parents challenged the policy before it went into force, before the first full school year when it was going to be in place. Linmar thinks that our parents didn't have standing until their children were literally already in a gender support plan. That's convenient because Linmar also refuses to tell parents when their children are in gender support plans. And it's also not the law. Plaintiffs don't have to wait until the damage is already done. They can sue pre-enforcement based on a substantial risk of harm. And cases go back and forth. Sometimes plaintiffs are able to prove that, sometimes they're not. But the plaintiffs that succeed are the ones that quantify the substantial risk with evidence. And here, we put forth undisputed social science and scientific evidence that these parents in particular, due to their specific circumstances, have children who are at a heightened risk of being subjected to this policy. So, for standing, you've alleged the heightened, what the parents think is a heightened risk for getting a gender support plan. Have you also alleged that there's a substantial risk that that child will not tell their parents or share that information that they also shared with the teacher? We have, Your Honor. In what way? How did you allege that? So, we have three parents for this purpose. Through C, correct? Parent A, in her declaration, states that her child is autistic and would be unable to really communicate effectively what's going on at school and unable to really consent with, give an informed consent to the school. And then the same with Parent B. The child has a serious neurodevelopmental disorder, has the same issue. Parent C is slightly different. She says there's a substantial risk her child wouldn't tell her because Parent C's child knows that Parent C strongly objects to asserting a new gender identity. On A and B, do we have to make that inference from the neurological issues? Because I'm not sure there's anything in the complaint that expressly says, and because of that, I think there's a substantial risk that this will happen in the school, which could, but it could also be that the child shares that with the parent. And then there would be no, the harmed injury would be not there. So, are we having to make an inference there for those parents? It's not an inference, it's just a, it's a risk, which Your Honor stated. It's in paragraphs 11 of Parent A's declaration and paragraph 10 of Parent B's declaration. It's sworn testimony and it's not disputed by the school that that, that their child would have those difficulties communicating and understanding and consenting as to what was going on. Where do they allege that the kid would actually go and request a gender support plan? I understood they allege that the children have these developmental disabilities and so forth, but I thought the policy said that it kicks in when the child requests a support plan. It, it sort of. The policy has a lower trigger than that. It says if a child requests a gender support plan or the child questions their gender or the child is gender non-conforming and talks to the school about it in any way, that gets you into the process. And what we've alleged is our children are at risk of asserting a new gender identity at school. And that's what all the allegations are about special needs. One child is autistic, one child runs in a friend group where everyone else is already identified as LGBT. Then we have all this evidence that, that peer pressure has a major effect on asserting a new gender identity. Autism has a major correlation with asserting a new gender identity. Other neurodevelopmental disorders have that same correlation. Where exactly does the policy say it's triggered if, without a request by the student? It's not without a request by the student. I think it's that. Well, you just said it. Sorry, Your Honor. I meant that. You just said it doesn't have to be a request. It could just be questioning their identity. It has to be a request by the student. Okay. Where do they allege that the children are likely to request a gender plan? Well, you don't have to request a gender support plan to be wrapped into the policy. There's also treatment by the school that will affirm your gender identity if you don't request a plan. That's in the policy. But if you do request a plan, or you do tell the school that you're questioning your gender or that you are gender non-conforming, that conversation happens. That gets you into the process as well. That's what I'm asking. Where does it say that in the plan, that you don't have to request a plan, that you just have to say something, where it says the school is committed to supporting students who are questioning their gender. But I thought the fight was about when the support plan is implemented. So I don't have it right in front of me, that exact quote, but the policy does clearly state you don't need to request a gender support plan for the school to affirm your new gender identity. That's in the policy. And so I think that's part of the risk. But the risk, Your Honor, we don't – Are you using the word express? It says those students have the right to express their gender identity. That's not the language. It's in the part of the policy that Judge Colleton is referring to. But it says, I think right in the next sentence, that you don't have to request it. You don't have to receive a gender support plan, a formal plan, in order for the school to affirm your gender identity. And our parents are concerned about both. But Judge Colleton, I'll admit to you, our declarations don't say our children are going to request a plan. How would our parents know that? It's a substantial risk case. They have a substantial risk of expressing a new gender identity at school. And that is the risk that they will be roped into this policy. And I think, you know, this is a – you're allowed to sue pre-enforcement. You're allowed to sue before your harm has materialized. And if these parents don't have pre-enforcement standing, I don't know who would. These aren't ordinary parents. They have children who are at a much more higher risk of being subjected to this policy, having a different gender identity affirmed at school than other children. It's backed up by lots of scientific and social science evidence that Linmar has not disputed at this stage. There is no evidence on the other side that our risk is not substantial. I think it's comparable to – Judge Benton, you wrote the Arc of Iowa case about school mask mandates. And I think there, the alleged risk was that students would contract COVID and have serious complications. And you said that that was sufficient for standing because they backed that up with scientific evidence about their particular conditions that made them susceptible. And the school said, well, what about vaccines? What about people voluntarily masking? What about social distancing? And, Your Honor, so they still had standing because there was a heightened risk. I think the Supreme Court's decision in the census case is another substantial risk case where the risk was if you ask people about their citizenship status, some illegal immigrants might not respond to the census, even though they have a legal obligation to do so. And even though the government has said they won't deport them if they answer. And that will lead to states potentially losing population, which will lead them to potentially losing members of Congress. I mean, it's – each one of those steps was a risk analysis, but it was satisfied because there was undisputed social science evidence in that case. What about redressability in the sense that – with Federal law? What – FERPA? Would these – the information that your clients are wanting from LINMAR, wouldn't that be in educational records that then would be covered under Federal law disclosure to parents? No. So – Why not? The school's policy explains why not. It says, warning, you know, your parents do have a right to access your educational records under FERPA. And then it says, therefore, we're not – We're not going to put them in there. We're not going to put them in there. We were trying to keep them from the parents, so we're going to put it in – We're going to create a temporary file, leave that with the counselor, and oh, by the way, the counselor has protected by law confidentiality that FERPA doesn't cover. So you're – So the – So is it pretty much agreed that the temporary file that you're talking about is not part of the educational records for purposes of Federal law? Is that – I don't know if my friend would agree with that. I think that's clearly what the policy says. That's what your position is. Yes. And the FERPA policy of the school says if there's something that's confidentially protected by law, parents can't get it either. And so I think this spells out the whole – the whole process for getting around FERPA. And, you know, this policy didn't come out of nowhere. It's been pushed by certain groups. It's been adopted by certain other schools. And the whole ideology – But none of those in Iowa. Is that what the record reflects? This is the only one in Iowa? As far as we know, yes, Your Honor. Okay. We said that in our brief and it went unrebutted. Okay. Proceed. The only one in Iowa. So I guess every other school in Iowa is violating Title IX, according to Lindmar, which is implausible. But it didn't come out of nowhere. There are groups that push this plan, and the idea is that if you tell parents there's kids or transgender, the parents might retaliate or backlash or hurt the child, which we don't think is accurate at all and certainly not something you're allowed to assume under the law. But that's the idea behind it, which is why they go to such lengths to prevent parents from getting this information. But that's only – Well, the policy hasn't been in effect yet, right? So we don't know how often that actually happens because many situations – or in some situations anyway, I suppose the student would say, fine, talk to my parents. So we don't really have any information about that yet, do we? I think that's right, Judge Kelley. I mean, the policy is in place now. This is the first full school year when it's been in place. But our standing is judged at the time when we filed, and so I think Lindmar would be upset if we introduced evidence. No. Well, I'm talking about sort of when you're – at your point in time when you file this to say that Lindmar is just systematically not wanting to tell any parent about any child who talks to them about transgender issues or gender identity. I don't know that that's supportable because we just don't know that the policy is more likely to be targeted to those limited students who don't feel comfortable to go home. I think the law takes care of that, Judge Kelley. So it's pre-enforcement. So you're right. We don't know exactly how it's going to be enforced. So we can read the policy and the text says parents don't get to know. And so our parents – Parent A, for example, was faced with a choice. Do I send my kid to Lindmar Middle School knowing that this policy is in place? And she decided, I can't do it in good faith. My child's autistic, has already in therapy for being unable to distinguish between male and female, has already said things that make people think that she's non-binary or gender non-conforming. There was a risk. So she did not send her kid to this school. So now every day her child does not get to go to her school of choice because of this policy. So your lead argument is substantive due process. What's the scope of the proposed unenumerated right that you want the court to recognize as likely to succeed? It's no broader than I think the right in Troxell and the right in Parham, which are two Supreme Court cases. Well, it's broader than those because the holdings of those cases are not on point. There's language in them about traditional rights and so forth, but the holdings are narrower. Right. They are different facts. They are definitely different facts. But Parham says that parents have a right to participate in important medical decisions for their children. We have put in undisputed evidence that the decision to affirm without question a child's gender identity is a form of medical psychosocial treatment. I think it follows very neatly from Parham. And then in terms of the right to participate, the Supreme Court in Troxell said you can't presume that parents don't know, don't do what's best for their children. This policy presumes the exact opposite. It leaves it totally in the child's control whether their parents are involved or not. And I think you articulate the substantive due process right that you want the Court to recognize. The right to what? I'll give you a broad and then a narrow answer. The broad answer is the right to control and direct the upbringing care of your child. That's extremely broad. That's broad. The narrow or the way that applies is before you do the treatment of affirming my child's different gender identity, I have the right to be informed and participate in that decision. And we're not What's the specific history and tradition of the United States that would support that? Well, I think, you know, the school gives parents a right to know and participate before they give them an aspirin. I think medical treatment is well protected. This is, I mean, this is not supported by our history and tradition telling, literally making core decisions about who your child is. Well, their policy may be contrary to history and tradition, but that's a different question from whether there's an unenumerated constitutional right. Right. Right. Cases like Arnold from the Eleventh Circuit, cases like the Gretzky case from the Third Circuit say you've got these sensitive family issues are what are protected by the right. And I can't think of a more sensitive issue than literally who your child is. It involves religion, spirituality, gender, sexuality, all sorts of very sensitive topics that I think actually go broader than some of the cases we've cited. I've got Do you want to say anything about the First Amendment? I'd love to. I'll just briefly, I think this policy, the respect policy is obviously content-based. It only applies when you're talking about gender identity. It's also obviously viewpoint-based. It requires you to respect someone's gender identity. It doesn't cover all speech about gender identity, but only ones that disrespect. And so the Supreme Court said in the Iancu case that triggers strict scrutiny. There's no possible way viewpoint discrimination ever satisfies strict scrutiny, and certainly not here. The only identified interest is preventing, is complying with anti-harassment and anti-discrimination laws. There has been no showing ever in this case that Title IX or state law or any other law requires the school to compel students to use each other's preferred pronouns, even if they choose not to in a very respectful way. That's what the Sixth Circuit held in Merriweather. Now, I had a question on standing relating to the First Amendment. There was also some standing discussion in the briefs about the First Amendment. But if the child's speech is compelled or regulated on a content-based way, how is that an injury to this organization? So, I think it's established that parents—children can't sue, so parents get to sue on their behalf. It's a third-party standing issue, but third-party standing is easily satisfied. There's a close connection between the parent and the child. The parents are members of our organization. We have standing if they have standing. But the parents here were not suing on behalf of the children, correct? They were suing on behalf of themselves. Or, actually, they're not suing at all. They're not suing. There's an organization, so.  They're not suing at all. But the— So, how does the—in Tinker, for example, the plaintiffs were the schoolchildren. Right. Here, you have no schoolchild, as I understand it, who is a plaintiff. The parents aren't suing on behalf of student A and so forth. So, how is it that the injury to the student harms the organization that's the plaintiff? That's what I'm trying to— Right. So, parents defending education as the plaintiff, it has associational standing if at least one member has standing. So, then you look to the parents. The parents have third-party standing on behalf of their children. I think that is what parents D through G are asserting. So, second-degree standing? It's third-party standing, Your Honor, but it's the most easily satisfied. It's the most easily recognized version of it. If it's easily recognized, what's the authority for parents having standing if a child is injured? I understand that parents can sue on behalf of children, but that's not what you've done here. So, what is your authority that a parent has standing to sue if a child is injured? You know, I don't have one on the tip of my tongue because this is not an argument that Linmar makes. Right. I know, but I— And I think third-party standing is not. Article III, I think maybe it is waivable in ways that other standing arguments are not. But we've also alleged injuries to the parents from having to deal with what their children are dealing with at school. I think some of the declarations go into the psychological harm of the parents as well if that's— Does Iowa have parental consortium? Iowa normal law? I'm not familiar with it, Your Honor. Thank you. You think third-party standing might not be Article III? Is that what you said? Yes. Meaning what? I should probably not spitball on third-party standing. I haven't thought about this because it's not an argument in the case, but I— Well, I understand it hasn't been briefed, but as I was reading the materials, I was trying to understand how we get from an injured child to an organizational standing. I guess I'll say two things, which is I think that is allowed under the law. I also think that whether you have a close enough relationship to assert third-party standing is probably waivable, and also there are allegations of injuries to the parents themselves in those declarations. Well, yeah. There was emotional distress allegations. And the right to make decisions about where their children go to school, things like that. Well, that was on the substantive due process claim, though, not the First Amendment, as I understood it. I see that I'm out of time. Well, I thought you might want to answer more questions, but— I'd love to, yeah. Well, yeah. Any more questions? Okay, very well. Thank you for your argument. All right, Ms. Van Heukelum, we'll hear from you. May it please the Court. Your Honors, my name is Miriam Van Heukelum. I represent Linn-Mar Community School District, its board, and its superintendent. We ask that this Court affirm the decision of the District Court to deny preliminary injunctive relief to the plaintiff. First, plaintiff lacks standing because they have not demonstrated an injury in fact. Injury in fact needs to be contemplated. Concrete and particularized. And at best, what parents A through C have proffered in their declarations is a chain of speculation. One thing might happen, and that might cause another thing to happen, and that might cause another thing to happen. And at the end of that chain of speculation, we might have a situation where the school district does not seek parental consent before providing a gender support— Okay, counsel, wait. You've already jumped to how you're going to enforce the policy. This is a facial challenge, pre-enforcement. And you say on my page one, I know it's an internet policy, any student, 7th grade, has priority over their parent. You say on the second page the student should agree whether the parent gets notified and whether they'll even participate. And you have five other statements and temporary files. Surely there's some pre-enforcement, facial issue here. I want to clarify the issue about the temporary file. While that term is not defined— Counsel, I know that. I would like you, because I think in your brief, you say many times, and I realize it's probably the board's policy and your administration's policy, that you aren't really going to enforce the words of this. Well, how do we know that? Well, because she says it in her brief. Oh, okay. Do you say that in your brief many times? I thought many times like pages— But you do seem to run away from the policy. I'll get to that. Yeah. But like on page 50 to 51, you have the while sentence that refers to maintaining your position, but the end of the sentence on page 51 does not. So tell me, do you believe the policy is going to be enforced like it reads or not? Maybe that's the way to focus the question. I think we may read the policy somewhat differently. The policy does contemplate that parents will be communicated with in the very first page. Communication with a student and or parent or guardian is key. Yeah, but it says and or, the linguistic monstrosity that means or. Now, don't do that. Look at the sentence I quoted. Any student in the seventh grade has priority over their parents. The student shall agree whether their parent participates at all. It doesn't necessarily mean that information will be withheld from the parent about the plan. It simply says that the preferences of older students who are approaching the age of majority would carry. Seventh grade is 13 or 12, right? 13 or 14. That's not approaching the age of majority. What's the age of majority in Iowa? Well, I'd say 18. Okay, thank you. Proceed. It also says the district shall not disclose information that may reveal a student's transgender status to others. Including parents. Unless legally required to do so. Well, other students, parents, and school staff. No, to others. Including, but not limited to, other students, parents, and school staff. So, that means that you can't disclose it to others unless it's legally required. Which FERPA would legally require if there's a written plan that it be provided to the parents. It would be a little unwieldy, keeping in mind that these policies are written by educators for students and educators, and not by lawyers. I would be surprised to see a policy that says others, including other students, other parents, and other school staff. The other's not before parents' counsel. The other is before students with a comma. It does carry to all three in a sentence. Do you understand that the Windmar School Board adopted this without consulting with a lawyer? Those facts are not in the record, and any consultation would be subject to an attorney-client privilege. Well, you just claimed that it was done by a school board without legal counsel. No, I didn't say that, Your Honor. I said that they are drafted by educators for educators and students' use. They're not drafted with the intent that the, you know, obviously that can happen sometimes, but they're not drafted with the intent that the primary audience for the policy would be attorneys or judges. Under the 14th Amendment argument asserted by plaintiffs, first we want to clarify that the policy does not say anywhere in there that a plan would be imposed at the prerogative of school administration. It says that it may be requested by the student or parent. There is also a distinction between what plaintiff infers or directly says is medical treatment and the kinds of social supports that are provided for in the policy. And in this case, the policy provides for things like being referred to by the name that the student has chosen, being referred to by other students and staff members in a way that affirms the student's preference the same way that a woman named Samantha may wish to be referred to by Samantha or Sam. This is in a school environment, so a student doesn't get to say something like Goofy or SpaceX or something like that, right? Correct, Your Honor. But that is the preferable name subject to general rules of school order that are, you know, subject to tinker would still carry the day. And I don't think Samantha choosing to go by Sam would be the kind of language or the kind of expression by a student that would be likely to be within the school's scope of authority to intervene. Earlier, you were wanting to talk about the temporary files. And I want to know what your view is on the role of these temporary files, because under federal law, the parents would have access to the educational records. So tell me what work this idea of moving information to a temporary file is doing. Thank you, Your Honor. Under FERPA, there is no definition of temporary record. It is just education records, and all education records of the student would be subject to inspection and review by their parents. Under Iowa rules of the Department of Education, there are definitions for a permanent file and a cumulative record that would be a record that a student would carry from district to district if they transferred, if they moved, if they open enrolled. A temporary record, while not defined under Iowa rules, would not necessarily need to follow the student from one district to another. It could be something that is in place for a semester, for a year, for the duration of the student's enrollment. But is this a phrase that is new to this, and maybe this isn't in the record, but is this terminology that's common in a school system, that there's an educational file and then a temporary file? Not with any relevance under FERPA, Your Honor. And I don't believe there are any facts in the record. We're here on a preliminary injunction, so we really have not developed the record to that extent yet. But I believe the intent was to differentiate between that permanent and cumulative folder and something that may be more ephemeral in nature. What's your best authority that a parent has a legal right to access a temporary record? Well, FERPA itself, Your Honor, 20 U.S.C. 1232-G, and I think this Court in Schmidt v. Des Moines Independent Community School District did state that it's an open question whether and to what extent a parent has a fundamental liberty interest in being able to access their child's education records. But under the federal laws, it certainly is a statutory right that that would apply. What's the citation of the statute that you think guarantees the right? 20 U.S.C. 1232-G. It's a Family Educational Rights and Privacy Act. But it doesn't refer to temporary records, does it? It doesn't. It defines education record and says that all education records of the student are subject to inspection and review of the parent. It doesn't differentiate and say that there are certain records that are shielded from view and others that are not. It says any education record of the student is subject to inspection and review by the parent. What's the definition of education record? Any record that contains personally identifiable information about a student and then there's a list of inclusive but not exclusive things like name, date of birth, any other information that could be used to identify the student. So it's any record, file, document, material containing information directly related to a student? Correct. And your view, if I understand your position, is that's the main file, that's the temporary file, that could be a number of things? Any education records that contain information personally identifiable about that student. Correct. So you're saying on behalf of the Linn-Marr School District that if you create a temporary record about a gender support plan and a parent asks, do you have a temporary record, a gender support plan regarding my child, then the school must turn it over? Yes, Your Honor. That's what it says in the policy and that's the position we took below. So several of the words and — I'm sorry. Go ahead. No, you were first. Well, I don't know where it says that in the policy. I was going to say the same thing. The policy says the opposite, Counsel. Well, the policy says that a parent or guardian has the right to review their student's education records under FERPA. It doesn't say excluding — It doesn't say that, does it? It does, Your Honor. It only has a backhanded reference to FERPA. No, on Appendix 298 it says that — let's see, it actually starts on 297. All students who are under the age of 18 or those over age of 18 who are claimed as dependents by their parents or guardians for tax purposes should be aware that a parent or guardian has the right to review their student's education records under FERPA, period, full stop, with no carve-out saying except temporary records or except gender support plans. Is that in Exhibit A, Counsel, you're quoting? That is — That's not Exhibit A, the policy. That's a dispute here, right?  It's 504.13R. Okay. So it is in Exhibit A. Yes. Which heading is it under? Because this is not numbered or, you know, organized like a document would normally be. Go ahead. It is under the heading of Establishment of Gender Support. So it starts on that section — I'm sorry, Confidentiality. Pardon me. My apologies. The section starting with Confidentiality, which starts on the Appendix at page 297 and ends at the top of Appendix 298. It's the one mention of FERPA, right, in the policy? Correct. Mm-hmm. I also want to address the — That's what — May. Yeah. Yeah. That's just an alert to the students that you should be aware that your parent has a right under FERPA. It doesn't define — May have a right. Yeah. May have a right. It doesn't say may have. It says has the right. Now, plaintiffs raised an argument that they did not — Wait. The one I have says may also, right? All right. Information about a student's transgender status may also constitute personally identifiable information under FERPA. Do I not have the right one? Mine's also one off your Internet, too, I might add. But it's different than the one in the record? Yeah. Okay. Well, at least the part under Confidentiality that you're — That must be changed. The counsel's referring to says — No. I'm sorry, Your Honor. I see what you're talking about in the first paragraph where it says that, yeah, any information — Okay. Good. Thank you. Right. There are two references to FERPA then. Right. But then if you look down at the end of that Confidentiality section, it says that minors should be aware that a parent or guardian has the right, not may have the right, has the right to review their student's education records under FERPA. I also want to distinguish the — So that's been taken out of the policy since this lawsuit began? No. That has been in the policy. The date stamp on this is 8-4-22. So you're talking about the last — You're talking about the last sentence of the second paragraph under Confidentiality. Correct. On appendix page 298. Yeah, yeah. I got it. I found it. Yeah. All right. Proceed. So what is — How — What is this policy doing then? Is it just sort of making it more difficult to get the records for a student in a situation where they have concerns about a parent or guardian having the information? Is this kind of a roadblock or is this doing really some substantive work for the student? Well, first and foremost, I think it's important to recognize that FERPA protects personal information about students from others, from other students, from staff members who don't have a legitimate pedagogical interest in those records, from other parents who might call and say, I want to know who the transgender kids in my student's class are. FERPA is first and foremost a confidentiality statute that protects the privacy of the student, not from their own parents, but from everybody else who might want to access or request information about those students. Schools field these requests routinely, whether in this venue or things like student discipline. I want to know if that student got suspended. I want to know if the kid who was bullying and harassing my kid got expelled. And so by notifying students that we will protect the privacy of this information, if you come to the building principal and say, I might want to go by a different name at school, I might want to use a different restroom at school, that that principal is not going to go make an announcement to the staff or go to the student's classes and say, okay guys, Samantha wants to be referred to as Sam from here on out, without obtaining proper consent to do so. But that last sentence of that section is intended to make clear so students are aware if they don't wish for their parents to access this information about them, that they don't request that the plan be implemented. So the student is making all decisions about this then? Well, not necessarily. We expected it. Well, you just said it. You said the student chooses, and the student should be aware, and the student. You have that start every sentence. And that is the point of this policy. The student has priority over the parent. For grades 7 through 12, that doesn't mean that the parent will not be included. We would assume and expect that in the vast majority of cases, parents would be the first people they're actually going to talk to. So now you're back to arguing how you're going to enforce it. And this is a pre-enforcement challenge to the bare naked language. And I think, Your Honor, that the question of what is the right or what is the scope of the parental right is not something that PDE is substantially likely to prevail on. They have pointed to no cases in the school environment. What about the Sixth Circuit case? Meriwether v. Hartop is distinguishable. It's a higher education case. It's not student versus student or student versus parent. It's a professor. There are implications of academic freedom that simply aren't present in the K-12 context under Tinker v. Des Moines. And it's not true. And you say all the Supreme Court language since 1927 is all dicta, right? No, not at all. Just that it is not directly on point here that this broad fundamental right — I think that's what dicta is, not directly on point. I think we're agreeing. But go ahead. Okay. Thank you, Your Honor. I think the Schmitt case most succinctly captures it, that there is not a clearly established right. And also the Arnold v. Escambia School District case cited in our brief. For these reasons, Your Honor, as we request — Well, before you sit down, I'd like to ask you about the First Amendment. Please do. Why isn't this suggestion that students will be disciplined if they don't respect another student's gender identity unconstitutionally vague? What does it mean to not respect a student's gender identity? That answer lies in the plain language of the section where that comes from, which is the section entitled Names and Pronouns. And in the context of names and pronouns, it does state every student has a right to be addressed by the name and pronoun that correspond to their gender identity and that students who intentionally or persistently misname or misgender — And or. So it could be unintentional, right? If it's persistent. If it's repeated, unintentional, and not respecting the student's gender identity, then — It will still have — I'm sorry, Your Honor. Then it could be the subject of discipline. It will still need to meet the conditions of the district's anti-bullying and anti-harassment policies, which are cross-referenced there, and establish specific standards that have to be met. And very similar to anti-discrimination and anti-harassment law, has to be objectively unreasonable, severe and pervasive, place the student in reasonable fear for their physical or mental well-being or interfere with their ability to learn. So it's not, you know, I think the red herring of the student who accidentally uses the wrong name a couple of times, it would not be captured by these policies. What if the student just intentionally says, I don't agree with the change of gender that you're proposing, and so I'm not going to acknowledge it by using the preferred pronoun? In the school setting where there is a, you know, tutelary privilege and the responsibility of the school to inculcate values of civility and respect in students, there is a significant difference between somebody espousing a belief or an opinion and how they refer to a classmate in the school context. The policy does not go to — Why doesn't the one necessarily include the other? If you say you must use a certain pronoun, why doesn't that bring with it the espousal of a view? Well, they don't have to use a certain pronoun. They simply can't use names and pronouns that are not chosen by that student as a matter of that civility and respect that Tinker and a number of Supreme Court cases have affirmed are within the school district's privilege. I think the district court got it right that, you know, in the school environment there are different rules that apply to the scope of the First Amendment right because students are learning the values of civility and respect, and they're a captive audience in a way that they're not out on the street. And so there are necessarily rules that schools can impose that go beyond what could be imposed in other settings. So saying, I believe gender is immutable and cannot be changed may implicate First Amendment rights. A student choosing not to call another student in a name — by a name that they prefer, while there may be some belief that's behind that, it's simply rude and disrespectful to refuse to refer to somebody by their chosen name, whether that's on the basis of gender identity or anything else. So you believe that respect is defined in the policy? I do not believe respect is defined in the policy beyond the fact that it exists in the section on names and pronouns. Okay. So you think — Oh, I thought you — go ahead. No. No, no, no. I was going to just do the follow-up. So you think the respect only applies to names and pronouns? And anything else that could constitute bullying and harassment, which are addressed under — They're already covered by the laws. Right. That's one thing I didn't ask you because it's kind of beside the point. But boy, Iowa has tough anti-bullying, anti-harassment statutes and state law and all that. Is this even needed, this section on names and pronouns? It clarifies what the district believes could be an example of bullying and harassment. Back to that. That's kind of beside the point. But on the point, so you think the respect is defined in effect by the policy to be names and pronouns? Yes. Your Honor. And not other stuff? What if the student — Not necessarily exclusively, but primarily identified as names and pronouns. Not exclusively names and pronouns. Not exclusively names and pronouns. I think there could be a wide variety of conduct on the basis of many protected classes that would run a follow-up state and federal law. Oh, no. Then it's not defined in the policy at all. So let's say the student says, I'd prefer you not come in the restroom while I'm using the restroom to the transgender student. Would that be failure to respect the student's gender identity? We don't have any facts in the record relating to restroom usage at all. That is not a portion of the policy. We're trying to define respect, Counsel. What's that, Your Honor? We're trying to define respect. Right. I'm sorry to step on your question. Yeah. Yeah. I think the difference between respect and bullying and harassment is maybe the question of two different policies. Respect in this context addresses names and pronouns. There are, of course, other actions on the basis of any protected class that could constitute bullying or harassment if it meets the definitions of district policy and state law. Well, it just doesn't say respect the student's choice of pronoun. It says respect the student's gender identity. And so the question is whether statements other than relating to the student's pronoun, preferred pronoun, might not respect the student's gender identity. You've written a policy in a way that goes beyond pronouns just on the face of it. But that language only exists in a section titled Names and Pronouns. It doesn't exist in the overall language of the policy or in any other section other than the section titled Names and Pronouns. Yeah. I guess it depends if you think that the heading somehow limits the sentence below. But that's the question we're wrestling with. You know, on redressability, you said there's no redressability in this case because the state statutes require the same thing. So I take it that your position is that every school district in Iowa must follow this policy, whether it's adopted or not, because it's the same as the state law? No, Your Honor. Our position is that individual boards are elected by their citizens to make policies. And as long as they are complying with the nondiscrimination and anti-harassment provisions of the law, they are not in violation simply because they don't have this policy or a policy that looks substantially similar to it, as long as the, you know, U.S. Department of Education or the Iowa Civil Rights Commission would not find that their actions fall short of the legal requirements that are set forth under Title IX and the Iowa Civil Rights Act. What was your point on redressability then? Our point on redressability is that even if an injunction were entered, state and federal law would still require the district to ensure that students have a safe learning environment, that they have an environment that is free from discrimination and harassment. General Rapp, would it require them to do the same things that are in this policy? We believe that most of the things in this policy have been covered, not necessarily in the plain language of the statute, but in our brief we cite to a number of pieces of regulatory guidance, both at the state and federal level, that talk about things like names and pronouns, restroom and locker room usage, and there are also both state and federal court precedents, the Vrew v. Iowa Department of Corrections decision from the Iowa Supreme Court, Bostock v. Clayton, which would give examples that are not in the plain language of the statute or the regs, but examples of how courts have said employers or schools must go about enforcing this nondiscrimination provision, necessarily the statutes are made. It seems like it's a yes or no answer, because in order for your redressability argument to work, the answer would have to be the statute already requires everything that's in the policy. Now, you just now said, well, most of the things it requires. I mean, could I go through the policy line by line and say that every single word in here is required? The general, the names and pronouns, the confidentiality of records, restrooms and locker rooms, I think you pointed to case precedents and federal and state regulatory guidance that would say that those things are within the broader definition of what Title IX or the Iowa Civil Rights Act requires to enforce that nondiscrimination provision. But not parental involvement. That's not been addressed, right? That has not been addressed, as this Court has indicated in Schmidt. Okay, thank you for your argument. Thank you very much, Your Honors. Mr. Norris, we'll hear from you in rebuttal. Thank you, Your Honors. I believe I ate into my rebuttal time on the initial go-around. No, why don't we put about three minutes on the clock there, please? Thank you, Your Honor. Three minutes. I've got four points. The first is, Your Honor brought up parental standing on behalf of children. I'd just like to, if Your Honor is interested in that question, to submit supplemental briefings, since it hasn't been briefed by the parties. But our hunch is that the parents have third-party standing on behalf of their children. The whole point of third-party standing is the person, the third party is not in the case. Well, you brought it up. Doesn't the Washington State Apples case say it's whether the members of the association have standing, and they stop at members? It's whether the members have standing, yes. Yeah, okay. And our members are parents who have third-party standing to sue on behalf of their children for the speech claim. The only case that comes to my mind is the Shemp case, where the Supreme Court said the parents had standing to raise an Establishment Clause claim on the view that the children would be indoctrinated with religion that the parents didn't agree with. That's a much better way to say what I was trying to say about the parental rights angle. I've never seen it recognized beyond that in a substantive due process case, or it might be applicable by analogy. Go ahead. I'd love to submit a brief on it, Your Honor, including on whether this is a waivable argument. What are the other three points? My second point is that you asked me about where in the policy does it say about gender support plans. The appendix, page 477, says all the student has to do is contact school staff about being supported on their gender identity. They don't have to request a gender support plan. And it says a gender support plan is not required for a student to receive supports at school. That's page 477 of the appendix. My third point is about FERPA. My friend said something about educational records and how that might cover a student's gender identity. It's not what the policy says. The policy iterates that you don't have to create a record in the first place of a student having their gender identity affirmed. Then it says that you do. It doesn't really say that, does it, counsel? Tell me the words that say that. They're careful not to say that, I think. They're careful to talk about temporary files and how they're going to share things. They hope it doesn't go anywhere. But they don't really say what you said, right? I believe they do, Your Honor. I'm sorry I don't have that direct quote. But there's a line in the policy that says that no record needs to be kept. I think it's in this discussion of records. And then the next thing it says is that you do need to maintain a formal record of the dead name, the non-gender identity different name. It also says, as I mentioned before, you keep a temporary file with the counselor. It says counselor communications are protected by law and things that are protected by law are not disclosable under FERPA. That's all in the policy. And all we have to prove for purposes of standing is that we're arguably right about this. Whether the policy actually does this or not would be a merits question. My last point is that for the first time I heard my friend say that to be covered under the speech policy also has to meet the definition of harassment or bullying or discrimination. That's a new argument. I haven't heard that one before. That's not what the policy says. I think that is variously in our brief. But go ahead. Make your point. The policy, even if it is, the policy says failure to respect someone's gender identity is a violation of those other policies. Not that it triggers those other policies. Then you go look to those policies to see where there's a violation. That's all I have. Thank you, Your Honors. Okay. Thank you for your argument. The case is submitted and the court will file a decision in due course. Counselor excused. Thank you.